```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
                       WESTERN DIVISION
```

_____

```
UNITED STATES OF AMERICA,      ǁ
                               ǁ
       Plaintiff,              ǁ
                               ǁ   Cv. No. 06-2398-B/V
vs.                            ǁ   Cr. No. 03-20093-B
                               ǁ
THOMAS R. DeCARLO,             ǁ
                               ǁ
       Defendant.              ǁ
                               ǁ
```

_____

```
              ORDER CORRECTING THE DOCKET
               ORDER GRANTING LEAVE TO AMEND
         ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255
              ORDER DENYING CERTIFICATE OF APPEALABILITY
                              AND
         ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
```

_____

Defendant Thomas R. DeCarlo, Bureau of Prisons ("BOP") inmate registration number 18885-076, who is currently an inmate at the United States Penitentiary in Marion, Illinois, filed a pro se motion pursuant to 28 U.S.C. § 2255 on June 26, 2006. (Docket Entry ("D.E.") 1.)[1]

Since the commencement of this action, Defendant has filed a number of additional documents. On October 2, 2006, Defendant filed an affidavit in support of the issues raised in his § 2255 motion. (D.E. 3.) On October 18, 2006, Defendant filed a motion for

_____

[1]   In a letter filed on April 13, 2007, DeCarlo notified the Court of his impending transfer to another prison. (D.E. 8.) The Court has obtained Defendant's new address from the BOP website. The Clerk is directed to mail Defendant a duplicate copy of this order, and the April 19, 2007 order (D.E. 9), to Defendant at his current address.

leave to amend his § 2255 motion to raise an additional issue. (D.E. 4.) For good cause shown, the motion for leave to amend is GRANTED. On November 30, 2006, DeCarlo submitted an amended factual affidavit in support of his motion. (D.E. 5.)[2] On March 21, 2007, the Clerk docketed a letter from DeCarlo asking about the status of the case.[3]

On March 18, 2003, a federal grand jury returned a two-count indictment against DeCarlo. The first count charged Defendant with traveling in interstate commerce with the intent to engage in a sexual act with a female child under the age of twelve, in violation of 18 U.S.C. § 2241(c) (the "aggravated sexual abuse" count). The second count charged DeCarlo with traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with a person under eighteen years old, in violation of 18 U.S.C. § 2423(b) (the "sexual abuse of a minor" count).

The case proceeded to a jury trial on November 10, 2003 and, on November 12, 2003, the jury found DeCarlo guilty on both counts of the indictment. The Court conducted a sentencing hearing on June 29, 2004, at which time he was sentenced to concurrent terms of two hundred ninety-three (293) months on count 1 and one hundred eighty (180) months on count 2, to be followed by a three-year

---

[2]     The Clerk docketed two affidavits on November 30, 2006, but D.E. 6 appears to be identical to D.E. 5 except that D.E. 6 contains two copies of the first page.

[3]     On September 11, 2006, the Clerk docketed a letter from DeCarlo asking for the exhibits in his criminal trial. (D.E. 2.) That motion was denied in a separate order.

period of supervised release.[4] Judgment was entered on July 8, 2004. The United States Court of Appeals for the Sixth Circuit affirmed DeCarlo's conviction on count 1 but held that, as the sexual abuse of a minor count was, under the circumstances of this case, a lesser included offense of the aggravated sexual abuse count, the convictions on both counts violated the Double Jeopardy Clause. The Sixth Circuit also vacated DeCarlo's sentence in light of <u>United States v. Booker</u>, 543 U.S. 220 (2005), and remanded the case with instructions to vacate the conviction on count 2 and resentence Defendant on count 1. <u>United States v. DeCarlo</u>, 434 F.3d 447 (6th Cir. 2006).

On remand, the Court conducted a resentencing hearing on April 20, 2006, at which time DeCarlo was sentenced on count 1 to two hundred ninety-three (293) months imprisonment, to be followed by a three-year period of supervised release. An amended judgment was entered on April 24, 2006. DeCarlo did not appeal.

The Sixth Circuit summarized the factual basis for the criminal prosecution as follows:

> The case arose from an investigation conducted by Special Deputy United States Marshal Dallas Dallosta working in conjunction with the Federal Bureau of Investigation's Crimes Against Children Task Force. In March 2003, Dallosta received a citizen's complaint

---

[4]      Pursuant to § 3D1.2(a) of the United States Sentencing Guidelines ("U.S.S.G."), the two counts were grouped for sentencing purposes because they involved the same victim and the same act. The base offense level for criminal sexual abuse, and attempt to commit criminal sexual abuse, is 27. U.S.S.G. § 2A3.1. DeCarlo received a four-point enhancement, pursuant to U.S.S.G. § 2A3.1(b)(2)(A), as the intended victim was under the age of 12, and a two-point enhancement, pursuant to U.S.S.G. § 2A3.1(b)(6)(B), because the defendant used a computer or an Internet-access device to facilitate the transportation or travel. Thus, DeCarlo's total offense level was 33. Given his criminal history category of VI, the guidelines provided a sentencing range of 235-293 months.

concerning an Internet chat room hosted by Yahoo.com. The chat room ostensibly had been established for adolescent girls to converse with one another online, but when Dallosta visited the site, she discovered a link to a profile of a person identified as "daddywantsagirl_veryynggirl." That individual had listed under the interests section of the profile page a category entitled "Kinki Kids." Investigating further, Dallosta discovered that the individual included a disturbing remark in the "hobbies" category. She testified:

> . . . a lot of times people in the hobbies will list, like you know, soccer, basketball, boating, camping, that type of stuff. But on this one I saw it says, "Looking for a girl to come live me whose parents will send to me. I'm very serious about that. I play no games. I want to start a family, a special family. Not into abuse, he he."

> So when that said—you know, when there was a 36-year-old male looking for a girl whose parents would give her permission to come live with him, that's what alarmed me.

J.A. at 150.

Dallosta then created a fictitious name, Valerie Murphy, and a bogus screen identifier, InsaneBlondie76, and sent an email to daddywantsagirl_veryynggirl. According to Dallosta's testimony, the message read:

> "I'm writing you because I hope you are real. I've gotten a ten-year-old girl dumped on me. Don't get me wrong, she's a good kid, but I can't take care of her." . . . . "I would love to—. . . . . find a good home for her. Let me know, but only if you are a nice guy. Please help me out."

J.A. at 155.

Daddywantsagirl_veryynggirl turned out to be the defendant, Thomas DeCarlo, a resident of North Carolina. He responded with an instant message to "Murphy" that asked about the possibility of taking the child, provided his telephone number, and gave a second email address. According to Dallosta, DeCarlo also described the type of girl he was looking for and what he proposed to do:

> "So what are you wanting?" He said, "Well, I'm wanting a girl who can commit to me and who would love to start a family with me." I said, "What age?" He said "10-18." I said, "Okay, so that's good. How

4

is she going to be treated?" He said, "Good." I
said, "I'm a little nervous." And then "little"
again . . . . He said, "Why?" I said, "I want her to
be treated good, but I can't do it." He said "Well,
I don't believe in hurting any girl. That is wrong."
I said, "I'm glad to hear that." He said "Thanks."
. . . . He said, "Anything you think I should know.
What does she look like?" I said, "She is skinny,
brownish blond hair, hazel eyes, kind of short for
age." . . . . He said, "Sounds very beautiful." I
said, "She's a cute kid." He said, "I bet." . . . .
He said "Great. So would she want me to make love to
her?" I said, "She don't care so long as she's not
getting beat."

J.A. at 156-57. DeCarlo also told Dallosta that the girl,
who Dallosta identified as "Samantha," would be going to
Greensboro to live in a house that cost him $100,000 and
that he might be willing to pay for Dallosta to bring
Samantha to him.

To further the subterfuge, Dallosta expressed
concern that DeCarlo might be an undercover police
officer setting her up. Dallosta's character, Valerie
Murphy, had been to jail and was unwilling to go back.
DeCarlo responded "Hell, no" he was not "a cop," and
offered to show Dallosta where Samantha would live using
a web camera. J.A. at 159. He then sent a real-time video
feed online to Dallosta. At DeCarlo's request, Dallosta
emailed him a picture of Samantha. The picture was really
that of Dallosta when she was ten years old.

Thereafter, Dallosta and DeCarlo determined that
DeCarlo would drive to Memphis, Tennessee to pick up
Samantha. DeCarlo asked how much a motel room would cost,
and Dallosta explained that she thought a room would run
him forty-five dollars. The two also talked of the
dangers of the trip: the potential of running into police
officers and that Murphy could end up in jail. DeCarlo
promised that he would drive slowly to avoid police and
give himself plenty of time to complete the trip.
Dallosta further informed DeCarlo that it would "break
Samantha's heart" if things went awry. DeCarlo promised
the trip would go smoothly.

After Dallosta and DeCarlo made the initial
arrangements, Dallosta testified that she placed a call
to DeCarlo on March 11, 2003. During the conversation,
Dallosta used a special phone meant to alter her voice so
she could pretend she was Samantha. The call lasted three
or four minutes, and DeCarlo indicated he knew who
Samantha was. Thereafter, during an internet

conversation, DeCarlo told Dallosta that he would leave
for Memphis on March 12, 2003, around 4:00 a.m. DeCarlo
estimated that he would arrive in Memphis at
approximately 3:00 p.m. and would meet Dallosta and
Samantha at a Super 8 Motel.

On March 12, 2003, Dallosta and an FBI agent,
Stephen Lies, went to the Super 8 Motel where DeCarlo was
to meet Dallosta. Dallosta observed DeCarlo checking into
the motel. DeCarlo was arrested by the Shelby County
sheriff's office and transported to the FBI office.
There, DeCarlo provided agents with a verbal statement,
which was later reduced to writing and signed by DeCarlo.
The statement read:

On March 10, 2003 "insaneblondie76" contacted me
over the Internet through an offline message. . . .
She said "hi" in the message. I looked at the
profile and did not know who she was so I said "hi"
back. We exchanged personal data and she asked if I
had and [sic] any kids, and I said yes, one who had
passed away. She told me that she had a girl named
Samantha, eleven years old, who was staying with
her. I thought it was her kid at first. She asked me
about where I lived and if it was a nice place. I
told her I live in North Carolina and she said she
lived in Memphis. She asked if I was coming to
Jackson, TN. I told her I was coming to the Memphis
area because I was looking for a job. She said it
was a long way. I told her I had a $100,000 house
and that jobs were scarce around here. I told her I
was going to Memphis to the cheapest hotel I could
find. She told me to try the Super 8 Motel on exit
23. I told her I was leaving shortly the next
morning because I wanted to get there. She started
talking about Samantha again and how she was abused
and abandoned by her mom. I took it as a joke when
she asked me if I wanted to have her as my daughter.
I said "sure" but I was joking. I had two kids of my
own. I talked to her yesterday and she asked if I
was still coming down and I said yes. She said she
would like to meet me at the motel and put the room
in her name. To hold it for me. That is how I
discovered her name was Valerie Murphy. I came into
Memphis this morning and checked into the motel. I
never met Valerie Murphy in person.

J.A. at 39. DeCarlo also signed a consent form allowing
agents to search his home, computer, and email accounts.

On March 13, 2003, Dallosta swore out a criminal
complaint before United States Magistrate Judge James H.

Allen. The complaint was signed on March 17, 2003 and an
arrest warrant was issued.

United States v. DeCarlo, 434 F.3d at 450-52.

DeCarlo has now filed a motion pursuant to 28 U.S.C. §
2255 in which he raises the following issues:

1.   His trial counsel rendered ineffective assistance,
     in violation of the Sixth Amendment;

2.   The arrest warrant in his case was obtained through
     perjured testimony;

3.   His indictment was obtained by perjured testimony;

4.   A Government witness committed perjury at trial; and

5.   He has obtained newly discovered evidence that a
     Government witness, using the "cut and paste"
     method, fabricated evidence against him.

In his amendment, which was filed on October 18, 2006, DeCarlo
raised the additional issue of prosecutorial misconduct. The Court
will first address issues 2-6 before turning to the ineffective
assistance claim.

In his second issue, DeCarlo complains that Deputy
Dallosta committed perjury in the affidavit used to obtain a warrant
for his arrest. DeCarlo identifies eight statements that he contends
were false and misleading, and he asserts that, if those statements
are omitted from Dallosta's affidavit, there was no probable cause
for issuance of the arrest warrant. (D.E. 1 at 8-13.)[5]

---

[5]   A copy of the affidavit of Deputy Dallosta is found in case no. 03-
20093, docket entry 1 ("Cr. D.E.").

The eight statements at issue are as follows:[6] (i) the affidavit stated that, on March 7, 2003, Dallosta, acting in an undercover capacity, sent an email to Defendant; (ii) the Affiant represented that, subsequently, she received an instant message from "daddywantsagirl_veryyounggirl@yahoo.com" and "a conversation (via computer) regarding this individual's desire to obtain a ten (10) year old female, named Samantha, was initiated;" (iii) the Affiant stated that, "[a]t the outset of the conversation DeCarlo asked Affiant if Samantha 'would want me to make love to her;'" (iv) the Affiant represented that, "[s]everal times during the conversation DeCarlo asked if Affiant was a 'cop' and that he hoped he was not being setup;" (v) the Affiant stated that "DeCarlo made plans to travel from North Carolina to Jackson, Tennessee in order to meet with Affiant and Samantha;" (vi) the Affiant stated that "DeCarlo made plans to rent a hotel room in Tennessee so that he could spend the weekend with the ten (10) year old female (Samantha);" (vii) the Affiant represented that "DeCarlo agreed to pay Affiant $100.00 in return for the child;" and (viii) the Affiant represented that, "during [a subsequent] computer conversation the subject of sex with the ten (10) year old was further discussed. DeCarlo 'promised' that he would be gentle with her."

As a preliminary matter, DeCarlo raised this issue on direct appeal, although his presentation was limited to the

---

[6]     The reasons why Defendant contends these statements constitute perjury will be addressed _infra_.

statement that he had agreed to pay for the child (Statement (vii)).
The Sixth Circuit rejected the issue on the merits:

> DeCarlo's motion to suppress was based on the arguments that he was arrested without probable cause, his consent to search his home and computer was invalid and the search was conducted without a warrant, and his statements were involuntary and taken in violation of his Fifth and Sixth Amendment rights. The district court rejected these arguments, and DeCarlo advances only the probable cause argument on appeal, but he bases it on a theory never presented to the district court. He now argues that the arrest warrant was issued in reliance on an affidavit that contained a false statement.
>
> The affidavit in support of the arrest warrant contained the following statement: "DeCarlo agreed to pay Affiant $100.00 in return for the child." DeCarlo points to Dallosta's trial testimony as evidence that the statement is not true. Dallosta testified to a conversation with the defendant via instant messaging:
>
>> Me, "One other thing." Him, "Okay." Me, "I hope you do not think I am a bad person, because I'm not, but." Him, "You are not bad. But what?" Me. "Is there any way you could maybe bring me $100 so I can get home? I am in such a bad way." Him, "I will try, I promise." Me, "Okay. Thank you so much. I feel really bad for asking, but I really need it, and I really think she will be worth all your trouble." Him, "To feel bad, look what I might bring home, a beautiful, loving girl. She is worth going to hell and back for."
>
> J.A. at 163. DeCarlo contends that the falsity of the statement in the affidavit concerning the payment of $100 renders the warrant invalid because of the absence of probable cause. We do not agree.
>
> As a threshold matter, this assertion was never raised before the district court and consequently need not be addressed on appeal. See Mich. Bell Tel. Co. v. Strand, 305 F.3d 580, 590 (6th Cir. 2002) (observing that "[t]his court does not ordinarily address arguments raised for the first time on appeal"). That defect notwithstanding, the record does not reflect that this single, isolated comment, even if improper, affects the finding of probable cause. Dallosta stated that she had several conversations with DeCarlo about his desire to come to Tennessee to pick up Samantha, have sex with Samantha, and start a family with Samantha. The affidavit

recites Dallosta's entire on-line encounter with DeCarlo
and plainly establishes his intent to cross a state line
for the purpose of obtaining a ten-year-old girl,
spending time in a motel room with her, having sex with
her, and returning with her to North Carolina. Those
facts establish a violation of 18 U.S.C. §§ 2241(c) and
2423(b) irrespective of any exchange of money. Moreover,
one plausible reading of the Internet exchange between
DeCarlo and Dallosta about the money is that DeCarlo was
willing to pay for Samantha: responding to Dallosta's
statement that she felt bad asking for money and Samantha
would "really . . . be worth all your trouble," DeCarlo
declared, "She is worth going to hell and back for."

The court finds no merit in the defendant's argument
that the arrest warrant was defective or that all the
evidence obtained thereafter should have been suppressed.

United States v. DeCarlo, 434 F.3d at 453.

"[A] § 2255 motion may not be employed to relitigate an

issue that was raised and considered on direct appeal absent highly

exceptional circumstances, such as an intervening change in the

law." Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999); see

DuPont v. United States, 76 F.3d 108, 110 (6th Cir. 1996). There are

no exceptional circumstances in this case and, therefore, this Court

will not revisit whether Statement (vii) in the factual affidavit

undermined the probable cause supporting the search warrant.

As for the remaining seven instances of alleged false

statements, the existence of probable cause for an arrest warrant

is not cognizable in a motion pursuant to 28 U.S.C. § 2255. A § 2255

motion is not a substitute for a direct appeal. Sunal v. Lange, 332

U.S. 174, 178 (1947).[7] Thus, as the Supreme Court explained,

---

[7]    Moreover, as the Sixth Circuit stated on direct appeal, the
objections to the validity of the arrest warrant should have been made in the
first instance through a suppression motion. See supra p. 9. Under those
circumstances, appellate review normally is limited to plain error. Fed. R. Crim.
(continued...)

"[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." <u>Stone v. Powell</u>, 428 U.S. 465, 477 n.10 (1976). Moreover, even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise these issues previously. <u>El-Nobani v. United States</u>, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); <u>Peveler v. United States</u>, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); <u>Phillip v. United States</u>, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating his "actual innocence." <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998). In this case, the Supreme Court's decision in <u>Stone v. Powell</u>, 428 U.S. at 489-95; <u>see also</u> <u>Boone v. United States</u>, No. 96-1398, 1996 WL 627760, at *2 (6th Cir. Oct. 29, 1996); <u>Richardson v. United States</u>, No. 93-6193, 1994 WL 194197, at *2 (6th Cir. May 16, 1994); <u>Kapsalis v. United States</u>, 345 F.2d 392, 394 (7th Cir. 1965), makes clear that Fourth Amendment issues may not be raised on collateral review. Accordingly, even if it is assumed that trial counsel rendered

---

[7]      (...continued)
P. 52(b); <u>see</u> <u>United States v. Lopez-Medina</u>, 461 F.3d 724, 739 (6th Cir. 2006). "An error is plain when it is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings." <u>Id.</u> (citing <u>Johnson v. United States</u>, 520 U.S. 461, 466-67 (1997)).

ineffective assistance by failing to pursue these objections to the arrest warrant, DeCarlo would not be entitled to relief.[8]

Even if that were not the case, this issue is entirely lacking in substantive merit.

> To prevail on a motion to suppress based on allegations of intentional misrepresentation by a law enforcement officer in the course of obtaining an arrest warrant, [a defendant] must establish (1) the allegation of perjury or reckless disregard ". . . by a preponderance of the evidence" and (2) with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause . . . ." United States v. Graham, 275 F.3d 490, 505 (6th Cir. 2001) (quoting Franks v. Delaware, 438 U.S. 154, 155-56 (1978)).

United States v. Bowker, 372 F.3d 365, 375-76 (6th Cir. 2004).[9] DeCarlo cannot satisfy either prong of this standard.

Defendant first complains that the affidavit stated that, on March 7, 2003, Dallosta, acting in an undercover capacity, sent an email to Defendant (Statement (i)). (D.E. 1 at 10.) According to DeCarlo, "there was no evidence present [sic] at defendant [sic] Trial to show defendant ever received that E- mail [sic]." (Id.) As a preliminary matter, in reviewing the probable cause for the issuance of a search warrant, the focus is on the information before the magistrate judge at the time the warrant was issued, Bowker, 372

---

[8]     DeCarlo has not alleged that his appellate counsel rendered ineffective assistance by failing to raise these matters on direct appeal. Moreover, the nature of DeCarlo's objections to the arrest warrant, which are technical in nature, do not raise any colorable issue as to his innocence.

[9]     Moreover, if this issue had been properly raised in a motion to suppress and on direct review, the Sixth Circuit "defers to findings of probable cause made by a magistrate, and will not set aside such findings unless they were arbitrarily made." Id. at 374. "When reviewing a district court's denial of a suppression motion, the [Sixth Circuit] reviews the district court's findings of fact for clear error and its conclusions of law de novo." Id.

12

F.3d at 374, not on the evidence introduced at trial. Moreover, a fair reading of the affidavit provides circumstantial evidence that DeCarlo did, in fact, receive the email:

> On March 7, 2003, your Affiant, acting in an undercover capacity, sent and [sic] e-mail from a Yahoo screen name "insaneblondie76" to "daddywantsagirl_veryynggirl@yahoo.com". Subsequently, an Instant Message from "daddywantsagirl_veryynggirl" was sent to Affiant's screen name and a conversation (via computer) . . . was initiated. The individual using the Yahoo screen name "daddywantsagirl_veryynggirl" provided identifying information to include his name as "Thomas DeCarlo", his residence as "Greensboro, NC", and his home telephone number as (336) 623-5659. DeCarlo also stated that he lived in North Carolina in a $100,000.00 house with his mother. DeCarlo also provided another screen name, "thunder11023@Hotmail.com" By which Affiant could remain in contact with him. . . . DeCarlo sent streaming video (live video) from his web cam (computer camera) to Affiant . . . . This video showed a front profile of DeCarlo and portions of what were represented to be his residence. DeCarlo's identity was verified through several database checks to include, Telephone Directory Assistance, Choicepoint Database, and the National Crime Information Center.

(Cr. D.E. 1.) Thus, DeCarlo's objection to Statement (i) is meritless.

Next, DeCarlo complains that the Affiant represented that, subsequently, she received an instant message from "daddywantsagirl_veryyounggirl@yahoo.com" and "a conversation (via computer) regarding this individual's desire to obtain a ten (10) year old female, named Samantha, was initiated." DeCarlo's objection to this statement is not clearly articulated, although it appears that he contends he did not specifically advertise for a ten-year-old girl or for a girl named Samantha. (D.E. 1 at 10.) Read in context, the affidavit makes clear that Dallosta, working undercover, initiated contact with DeCarlo, a member of a Yahoo

group named "Kinki Kids," because his Yahoo profile indicated that he wanted to find a young girl to live with him:

> When that webpage was accessed, there was a list of all Yahoo members, and links to their profiles, that had also listed "Kinki Kids" as one of their interests. Your Affiant began looking at these profiles and found one screen name titled "daddywantsagirl_veryynggirl". Listed on this profile for this screen name was a picture of a minor female appearing to be 12-13 year [sic] old and a plea from "daddywantsagirl_veryynggirl" for this minor to contact him. Under the hobbies category, "daddywantsagirl_veryynggirl" listed that he was looking for a girl whose parents would let her come to live with him. The profile indicated that another Yahoo profile screen name titled "daddyslilgirls_verylilgirls" had been disabled by Yahoo.

> On March 7, 2003, your Affiant, acting in an undercover capacity, sent and [sic] e-mail from a Yahoo screen name "insaneblondie76" to "daddywantsagirl_veryynggirl@yahoo.com" offering to fulfill his request for a young girl and if interested to contact affiant at the "insaneblondie76@yahoo.com." Subsequently, an Instant Message from "daddywantsagirl_veryynggirl" was sent to Affiant's screen name and a conversation (via computer) regarding this individual's desire to obtain a ten (10) year old female, named Samantha, was initiated.

(Cr. D.E. 1.) Although Deputy Dallosta's original email was not quoted in the search warrant affidavit, it was introduced at trial. In that email, Dallosta represented she had custody of a ten-year-old girl who needed a good home. (Trial Ex. 9; see supra p. 4.) The email did not mention the child's name, and Dallosta did not use the name "Samantha" until the subsequent instant message conversation. Nonetheless, DeCarlo has not established that this statement in the arrest warrant affidavit misled the magistrate judge to find probable cause. The affidavit makes clear that DeCarlo was advertising for a young girl and that he responded to the offer of

14

a ten-year-old girl. The name of the child is immaterial. DeCarlo's objection to Statement (ii) is without merit.

Next, DeCarlo objects to the statement that, "[a]t the outset of the [instant message] conversation DeCarlo asked Affiant if Samantha 'would want me to make love to her.'" (D.E. 1 at 10.) DeCarlo states that he did not use the name "Samantha." He also suggests that Deputy Dallosta may have altered the chat transcript using the "cut and paste method." (Id.)

The Court has examined the chat transcript, which was introduced at trial. (Trial Ex. 10.) Although DeCarlo is correct that he had not heard the name "Samantha" at the time he made the statement "would she want me to make love to her," the name of the child is not relevant to the finding of probable cause.

DeCarlo has the burden of proving, by a preponderance of the evidence, that Deputy Dallosta altered the chat transcript and manufactured the statement "would she want me to make love to her." In his motion, and its various supplements, DeCarlo has speculated that it would have been possible for Dallosta to alter the transcript, but he has come forward with no evidence that this occurred.

Therefore, the objection to Statement (iii) is without merit.

Decarlo also objects to the statement in the affidavit that, "[s]everal times during the [online] conversation [on March 7, 2003] DeCarlo asked if Affiant was a 'cop' and that he hoped he was not being setup." Defendant complains that it was "Deputy

15

Dallosta is the one who introduced the suspicion of Police involvement." (D.E. 1 at 10.)

An examination of the chat transcript establishes that Deputy Dallosta was, indeed, the first to mention the possibility of a police sting. (Trial Ex. 10 at 2.) Shortly after "Valerie Murphy's" two references to the police, however, "daddywantsagirl_veryynggirl" stated "just be carefull [sic] that no cops know what we might do." (Id. at 3.) Later in the conversation, "daddywantsagirl_veryynggirl" stated, "i hope you are not a cop or i am history." (Id. at 5.) Subsequently, on March 9, 2003, DeCarlo sent "Valerie Murphy" six offline messages expressing a concern that she was an undercover officer. (11/10/03 Tr. at 180, 182-84; Trial Ex. 17.) Finally, on March 11, 2003, during an online chat, DeCarlo, using the screen name "thunder11023us2001," "i am just so scared that this might be a setup please tell me it is real." (Trial Ex. 23.) During a second online conversation on March 11, 2003, DeCarlo returned to the subject. According to the transcript, the following exchange occurred:

**thunder11023usa2001:**    now i have to ask this
**insaneblondie76:**    yeah
**thunder11023usa2001:**    there will be no cops waiting for me or waiting to arrest me right
**thunder11023usa2001:**    i am sorry
**insaneblondie76:**    i swear 2 god there wont b there-can u say the same?
**thunder11023usa2001:**    i have to make sure

(Trial Ex. 22 at 1.) Later in that conversation, "thunder11023usa2001" said: "as long as no cops will be with you." (Id. at 2.)

The arrest warrant affidavit does not state that it was DeCarlo who first introduced the topic of a police setup, and the evidence introduced at trial permits a conclusion that DeCarlo repeatedly expressed a concern that "Valerie Murphy" was a police officer or a police informant. DeCarlo's objection to Statement (iv) is without merit.

Next, DeCarlo complains about the statement in the affidavit that "DeCarlo made plans to travel from North Carolina to Jackson, Tennessee in order to meet with Affiant and Samantha." Defendant's objection to this statement is not clearly articulated. The motion states as follows:

> The Defendant argues That when Deputy Dallosta read the March 07, 2003 chat conversation into the record that there was only a discussion with the defendant about making the trip. Diputy [sic] Dallosta further read into the record the Marck [sic] 11, 2003 chat conversation in which the defendant stated he could make the trip. . . . Deputy Dallosta states: well, let's get our plans together.

(D.E. 1 at 10 (record citation omitted).)

An examination of the March 7, 2003 chat transcript indicates that, shortly after DeCarlo decided he was interested in obtaining the girl, the parties began a discussion about when and where to meet. DeCarlo stated, "i am going to do everything to get her here." (Trial Ex. 10 at 2.) "Valerie Murphy" stated that she could not travel with the girl to DeCarlo's home in North Carolina, and she was not comfortable letting the child travel alone. (Id.) At that point, the parties began to discuss a meeting in Jackson, Tennessee:

```
insaneblondie76:               maybe we could meet
daddywantsagirl_veryynggirl:   ok
insaneblondie76:               somewhere
daddywantsagirl_veryynggirl:   ok
insaneblondie76:               i don't have a good car but
i don't want 2 do it where i live. maybe a close town
daddywantsagirl_veryynggirl:   ok
daddywantsagirl_veryynggirl:   just let me know where you
live and i will try to find a closer town
insaneblondie76:               im in memphis
daddywantsagirl_veryynggirl:   just be carefull [sic] that
no cops know what wemight do
insaneblondie76:               i no a motel in jackson
daddywantsagirl_veryynggirl:   ok
```

(<u>Id.</u> at 2-3.) DeCarlo then remarked that it would take ten (10) hours or more to drive to Jackson. (<u>Id.</u> at 3.) Later in the conversation, the parties discuss the possibility of letting "Samantha" decide whether she wants to go to North Carolina with DeCarlo after they spend the night together at the motel. (<u>Id.</u> at 4.) Some time after that, the following exchange occurred:

```
insaneblondie76:               when do u want 2 meet her
daddywantsagirl_veryynggirl:   soon i hope
```

(<u>Id.</u> at 5.) The parties then return to a discussion of the logistics of the trip (<u>id.</u> at 5-6), and then began to discuss when the meeting would occur:

```
daddywantsagirl_veryynggirl:   so when would be best for
you
insaneblondie76:               u r goin out of ur way- i
will be there when u say
daddywantsagirl_veryynggirl:   ok
daddywantsagirl_veryynggirl:   next Saturday
insaneblondie76:               cant wait!!!
daddywantsagirl_veryynggirl:   same here
daddywantsagirl_veryynggirl:   i will have to be back by
Sunday evening

. . . .

insaneblondie76:               u 2 can spend the weekend
2 gether gettin 2 no each other
daddywantsagirl_veryynggirl:   great
```

> **daddywantsagirl_veryynggirl:** i may be able to leave Friday about noon

(<u>Id.</u> at 6.)

On March 9, 2003, DeCarlo, using the email address "thunder11023@hotmail.com," sent an email to "insaneblondie76," titled "weekend plans," that stated:

> hi, i got ur email and have fun i hope to meet you soon tell samantha i love her and i hope to be everything she wants love thom

(Trial Ex. 16.)

On March 10, 2003, the parties had an online chat in which the weekend meeting in Jackson was discussed:

> **insaneblondie76:**               I'm just tryin 2 keep [Samantha] from gettin 2 xcitd til we get everything worked out
> **daddywantsagirl_veryynggirl:** well i looked it up it will take about 10 hours to get to jackson
> **insaneblondie76:**               ok do u no when u want 2 do it
> **daddywantsagirl_veryynggirl:** by this weekend if you can
> **insane blondie 76:**            the sooner the better- thats great
> **daddywantsagirl_veryynggirl:** it matbe sooner
> **insaneblondie76:**               great-when will u no
> **insaneblondie76:**               will u
> **daddywantsagirl_veryynggirl:** tomarrow
> **insaneblondie76:**               ok-soon as it is 4 sure I'll let samantha no and she can call u
> **daddywantsagirl_veryynggirl:** my truck should be out of the shop tommarrow

(Trial Ex. 19.)

The next day, March 11, 2003, the parties had an online chat in which DeCarlo, using the screen name "trunder11023us2001," told "Valerie Murphy" that he had the money for the trip and his truck was ready. (Ex. 21.) He then stated: "so i should be there tomarrow." (<u>Id.</u>)

Thus, DeCarlo has not met his burden of demonstrating, by a preponderance of the evidence, that Statement (v) was intentionally false or made with reckless disregard for the truth. The objection to Statement (v) is without merit.

Next, Defendant challenges the statement that "DeCarlo made plans to rent a hotel room in Tennessee so that he could spend the weekend with the ten (10) year old female (Samantha)." The objection is as follows:

> The Defendant argues that again when Deputy Dallosta read the Chat conversation at Trial, the truth was again different. Deputy Dallosta states the following, "me, You don't have to come to Memphis, if it's to far. I can make it to Jackson, Him, yes, I know about five hours. I will needa [sic] Motel room for sure, (see Trial Transcript NOV. 10, 2003 page 144 at lines 7-11) than [sic] on the same page at lines 24 and 25 The defendant asks: Do you know how much a room "overnight" would cost there. The defendant argues that Deputy Dallosta further mislead the courts to obtain the arrest warrant.

(D.E. 1 at 10.)

An examination of the trial testimony and exhibits indicates that DeCarlo planned to come to Tennessee to spend the night in a motel room with a ten-year-old girl before taking her back to North Carolina. As previously noted, see supra p. 17-18, in the March 7, 2003 conversation the parties discuss letting "Samantha" decide whether she wants to live with DeCarlo after they spend the night in a motel. In the portion of that conversation cited by Defendant, DeCarlo says he will need a hotel room if he travels to Jackson and asks about the price. (Trial Ex. 10 at 5-6.) DeCarlo planned to arrive on "next Saturday" and "be back by Sunday evening" (id. at 6), and then the following exchange occurred:

20

> **insaneblondie76:**              u 2 can spend the weekend
> 2 gether gettin 2 no each other
> **daddywantsagirl_veryynggirl:**  great

(Id. at 6.)

During the second online chat on March 11, 2003, "Valerie
Murphy" directs DeCarlo to a motel in Memphis:

> **thunder11023usa2001:**     well i am on my way in the
> morning
> **insaneblondie76:**         ok-at exit 23 Canada Road there
> a Super 8 motel that u can see from i-40. I can hold u a
> room til 6 in my name. $34.50. I spoke 2 while u ate.
> **thunder11023usa2001:**     ok

(Trial Ex. 22 at 1.) The subsequent conversation makes clear that

DeCarlo intended to have sexual contact with "Samantha" during the

night he planned to spend in Tennessee:

> **insaneblondie76:**         ok can i give a few rules that
> will make me feel like im doin the best thing?
> **thunder11023usa2001:**     sure
> **insaneblondie76:**         ok-shes a virgin and she isn't
> afraid 2 have sex, but i got 2 know u r not going to
> force her 2 do something she doesnt want 2
> **thunder11023usa2001:**     i promise
> **thunder11023usa2001:**     it would be wrong
> **insaneblondie76:**         if u r gentle i think everything
> will b just fine. Let her b comfortabl;e [sic] with u
> **thunder11023usa2001:**     i will
> **thunder11023usa2001:**     i can not force her to do
> anything she does not want to
> **insaneblondie76:**         ok also do u plan 2 marry her
> oneday
> **thunder11023usa2001:**     if she wants me to yes
>
> . . . .
>
> **insaneblondie76:**         . . . don't be knockin her up
> though-unless u r going 2 marry her
> **insaneblondie76:**         thats not right
> **thunder11023usa2001:**     i won't
> **thunder11023usa2001:**     i do want to marry her tho
> **insaneblondie76:**         ok i just want 2 make sure shes
> takin care of
> **thunder11023us2001:**      good
> **thunder11023us2001:**      i understand
> **insaneblondie76:**         ok another thing i want to do ok

21

```
    thunder11023us2001:          ok
    insaneblondie76:             i want 2 see her thurs [sic]
    morning b4 yall leave so i can make sure shes ok and say
    goodbye so i wont have nitemares
    thunder11023us2001:          as long as no cops will be with
    you
```

(Id. at 1-2.)

DeCarlo's objection to Statement (vi) is meritless.[10]

Finally, DeCarlo complains about the statement that, "during [a subsequent] computer conversation[,] the subject of sex with the ten (10) year old was further discussed. DeCarlo 'promised' that he would be gentle with her." DeCarlo reads the exchange quoted previously, see supra p. 21, and states:

> The defendant argues Deputy Dallosta introduced the concept of the defendant having sex with the child and the defendant assured her that such was not the case. There is more than sufficient evidence in the record to find that the defendant's motive was "NOT" to have sex with the fictitious child. Deputy Dallosta deliberately twisted words to suggest that the defendant had the requisite motive to commit the acts charged against him. The truth is that he, simply did not.

(D.E. 1 at 11.)

DeCarlo's argument ignores the facts that led Deputy Dallosta to him in the first place. As previously noted, see supra pp. 13-14, the search warrant affidavit stated that Dallosta discovered the Yahoo profile for "daddywantsagirl_veryynggirl" by searching the members of the "Kinki Kids" group. In that profile, "daddywantsagirl_veryynggirl" lists his interests as including "Kinki Kids," "All in the Family," "Strangers With Candy," "Preschools," "Elementary School," "The Young Ones," "Puberty,"

---

[10]   Statement (vii) is not addressed because it was resolved by the Sixth Circuit on direct appeal. See supra pp. 8-10.

"Cherry Poppin' Daddies," "Older Men With Younger Women," "Masturbation," and "Training and Obedience." (Trial Ex. 6.) Under hobbies, the profile states:

> looking for a girl to come live with me who parents will send to me i am VERY SERIOUS ABOUT THAT i play no games i want to start a family a special family not into abuse hehe

(Id.) The profile includes a picture of a young teenage girl, who is dressed and posed provocatively, and asks "the girl in the picture please contact me." (Id.) The profile also states that "yahoo killed my other id daddyslilgirls_verylilgirls." (Id.)[11] Moreover, as previously discussed, see supra pp. 14-15, DeCarlo also asked "Valerie Murphy," near the beginning of their first online chat on March 7, 2003, whether the ten-year-old girl "would want [him] to make love to her."

DeCarlo's interpretation of the quoted discussion with "Valerie Murphy" is also improbable. The Court previously concluded, in the discussion of Statement (vi) that that discussion supported an inference that DeCarlo intended to have sexual contact with "Samantha" while in Tennessee. See supra pp. 21-22. "Valerie Murphy" represented to DeCarlo that Samantha is "a virgin and she isn't afraid to have sex," but she asked DeCarlo to promise not to commit forcible rape. In context, DeCarlo believed he was meeting with a willing ten-year-old girl. Although DeCarlo arguably assured "Murphy" that he would not force "Samantha," he clearly expected to

---

[11]   At trial, Deputy Dallosta also testified about the disabled profile, which further documents DeCarlo's sexual interest in preteen girls. (11/10/03 Tr. at 98-103.) The Court will not address that profile now as it was not before the magistrate judge who issued the arrest warrant.

have sexual contact with her and his statement that "it would be wrong" can reasonably be understood in that context.[12]

Accordingly, DeCarlo's second issue is without merit and is DISMISSED.

In his third issue, DeCarlo asserts that his indictment was obtained through perjured testimony before the grand jury. Defendant has identified nine (9) statements Deputy Dallosta made before the grand jury, most of which have been dismissed in connection with issue 2, that he contends are false, and he suggests that his conviction must be vacated because of those false statements before the grand jury. (D.E. 1 at 13-14.)

The nine statements at issue contained in the testimony of Deputy Dallosta are as follows:[13] (i) that DeCarlo responded to her initial email, sent on March 7, 2003, within the hour; (ii) that she asked DeCarlo the age of the girl he was looking for and he responded that it did not matter so long as she was between ten (10) and eighteen (18);[14] (iii) that "[h]e said he could come the next weekend, purchase her. I told him I needed a hundred dollars for the child. He said he would get the money, drive to Tennessee" (D.E. 1 at 13); (iv) that DeCarlo and the girl were going to stay the

_____

[12]    At trial, Deputy Dallosta also testified about other discussions with DeCarlo about his sexual interest in "Samantha," but the Court will not address those discussions now as they are not recounted in the arrest warrant affidavit.

[13]    As the grand jury transcript is not available to the Court, the Court has, for the most part, accepted Defendant's representation about what was testified to before the grand jury. The reasons why Defendant contends these statements constitute perjury will be addressed infra.

[14]    In his motion, Defendant says "10 to 81" (D.E. 1 at 13) but the transcript of the chat conversation indicates that he said "10 to 18" (Trial Ex. 10 at 1).

weekend at the motel; (v) that DeCarlo planned to have sex with the girl at the motel; (vi) that DeCarlo was concerned that "Valerie Murphy" was a cop; (vii) that DeCarlo stated during the first chat conversation, on March 7, 2003, that he was in love with "Samantha;" (viii) that "[h]e originally in the first chat, he asked me if Samantha wanted him to make [l]ove to her" (D.E. 1 at 13); and (ix) that DeCarlo was going to purchase the girl for one hundred dollars.

DeCarlo is, in essence, asking the Court to dismiss the indictment due to misconduct before the grand jury. It is far from clear that the Court has the authority to take that action even before trial. As the Supreme Court explained:

> The Fifth Amendment provides that federal prosecutions for capital or otherwise infamous crimes must be instituted by presentments or indictments of grand juries. But neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act. . . .
>
> . . . If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. <u>An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.</u>

<u>Costello v. United States</u>, 350 U.S. 359, 361-63 (1956) (footnote omitted; emphasis added). In this case, "[t]here is no claim that the grand jury was not 'legally constituted' nor that the indictment returned was not 'valid on its face.'" <u>United States v. Adamo</u>, 742 F.2d 927, 936 (6th Cir. 1984). Instead, DeCarlo contends, in effect,

that the grand jury was made biased through the introduction of the allegedly perjurious testimony of Deputy Dallosta.

It is not clear that a defendant who was convicted at trial can overturn his conviction because of perjury before the grand jury. In <u>United States v. Basurto</u>, 497 F.2d 781, 785-86 (9th Cir. 1974), the Ninth Circuit held that

> the Due Process Clause of the Sixth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel—and, if the perjury may be material, also the grand jury—in order that appropriate action may be taken.

The Ninth Circuit reversed the defendant's conviction because the prosecutor, who had informed defense counsel upon learning of the perjury but who did not inform the court, "did not take appropriate action to cure the indictment upon discovery of the perjured grand jury testimony." <u>Id.</u> at 787.

"<u>Basurto</u> has been accorded mixed reviews, even by the court which decided it." <u>United States v. Manqual-Corchado</u>, 139 F.3d 34, 41 (1st Cir. 1998). Several years after <u>Basurto</u>, Justice Rehnquist wrote the following in explaining the denial of an application to stay enforcement of a criminal judgment on the basis of alleged perjury before the grand jury:

> Because it seems to me that applicants misconceive the function of the grand jury in our system of criminal justice, I cannot conclude that four Justices of this Court are likely to vote to grant their petition. The grand jury does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them

26

true, so as to require him to stand his trial. Because of this limited function, we have held that an indictment is not invalidated by the grand jury's consideration of hearsay, Costello v. United States, 350 U.S. 359 . . . (1956), or by the introduction of evidence obtained in violation of the Fourth Amendment, United States v. Calandra, 414 U.S. 338 . . . (1974). While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of that factfinding process, its introduction before the grand jury poses no such threat.

Bracy v. United States, 435 U.S. 1301, 1302 (1978) (Rehnquist, Circuit Justice).

The Sixth Circuit first addressed the issue in United States v. Adamo, 742 F.2d at 940, which stated that

[w]e are in agreement with the basic ethical philosophy of the Ninth Circuit's Basurto decision, especially as it requires the prosecution to avoid knowingly using perjured testimony at any point in the prosecution of a case. We disagree, however, with the portion of the decision which requires the prosecutor, upon learning of material perjury before the grand jury, to return to the grand jury and seek a superseding indictment if jeopardy has not yet attached or suffer the sanction of having the indictment quashed. Further, while the Basurto decision does not address the question, we think it implies that the prosecutor would be obligated to move for dismissal if it were discovered during the trial that some material before the grand jury had been perjured. For the reasons discussed herein, we feel that this also is not mandated.

Id. The Sixth Circuit required prosecutors to

personally weigh the untainted evidence supporting the government's case and decide if the evidence is such that a jury of twelve if likely to unanimously find that the evidence establishes guilt beyond a reasonable doubt. If the prosecutor is doubtful of such a result, the untainted evidence may be resubmitted to the grand jury to determine if thirteen jurors are prepared to find that a crime was committed and that there is probable cause to believe that one or more of the original defendants committed that crime. The prosecutor may also decide that the untainted evidence is insufficient to warrant pursuing the prosecution further and move to dismiss the indictment. A conscientious government attorney will go to trial only if personally satisfied that the untainted

> evidence is sufficient to meet the government's burden of proof, despite the fact that trial is fully adversarial and subject to the federal rules of evidence and procedure. We see no reason to impose the rigid Ninth Circuit rule and deprive the prosecutor of the right to exercise these options.

Id. at 941. Thus, a defendant seeking a reversal of his conviction due to a trial court's failure to exercise its supervisory power to dismiss an indictment due to the introduction of perjured testimony before the grand jury must show both actual prejudice, id., and "longstanding prosecutorial misconduct," id. at 942.[15]

DeCarlo is not entitled to relief on his third issue for several reasons. First, for the reasons previously stated, see supra pp. 10-11, the issue has been procedurally defaulted because no motion to dismiss the indictment was filed and the issue was not raised on direct appeal. Thus, because DeCarlo is not actually innocent of the offense, he cannot raise this issue in a § 2255 motion even if it is assumed that trial counsel rendered ineffective assistance in failing to file a motion to dismiss the indictment. Moreover, as DeCarlo was convicted after a jury trial in which the transcripts of all the emails and chat conversations were introduced into evidence, DeCarlo cannot establish that he was actually prejudiced by any misstatements during the grand jury testimony of Deputy Dallosta. Manqual-Corchado, 139 F.3d at 42 ("As the trial

---

[15]   Other Sixth Circuit decisions have emphasized that a court should exercise its supervisory authority over grand juries only on a showing of longstanding prosecutorial misconduct. See, e.g., United States v. Hughes, No. 95-5420, 1996 WL 515343, at *4 (6th Cir. Sept. 10, 1996); United States v. Griffith, 756 F.2d 1244, 1249 (6th Cir. 1985) ("In this Circuit, the law is clear that a court may not order dismissal of an indictment under its supervisory power unless the defendant demonstrates that 'prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in [the] district.'") (alteration in original) (collecting cases).

jury found guilt beyond a reasonable doubt, we are not persuaded that a similarly informed grand jury would not have found probable cause."); see also United States v. Roth, 777 F.2d 1200, 1204 (7th Cir. 1985). Third, the motion does not set forth any facts suggesting there is a longstanding pattern of prosecutorial misconduct in this district. For these reasons, the Court declines to conduct a belated review of the grand jury proceedings.

Finally, just as with Defendant's assertions of perjury in the arrest warrant affidavit, DeCarlo's assertions of perjury before the grand jury appear to be entirely lacking in substantive merit. The substance of Statements (iii), (iv), (v), (vi), (viii), and (ix) was considered and rejected in connection with the arrest warrant affidavit.

As for Statement (i), DeCarlo contends that Deputy Dallosta committed perjury when she testified that he responded to her initial email, sent on March 7, 2003, within the hour. (D.E. 1 at 13.) This testimony, which was also presented at trial, appears to be substantially accurate. At trial, Deputy Dallosta testified that she sent the initial email to "daddywantsagirl_veryyngirl@yahoo.com" at 3:11 p.m. on March 7, 2003 and Defendant responded approximately thirty (30) minutes later. (10/12/2003 Tr. (Cr. D.E. 77) at 109, 114.) The date line of the email says it was sent on "Fri, 7 Mar 2003 13:11:22 –088 (PST)," or 1:11 P.M. Pacific Standard Time. (Trial Ex. 9.) As Dallosta testified that she sent the email from her computer at FBI

headquarters in Memphis, Tennessee,[16] the local time would have been 3:11 P.M. Central Standard Time. The first screen shot of Deputy Dallosta's computer during the ensuing real-time conversation was taken at 4:30 P.M. Central Standard Time, or ninety (90) minutes later,[17] when Defendant turned on his web camera to show "Valerie Murphy" the home in which "Samantha" would be living.[18] Therefore, the Court is unable to conclude that Dallosta's testimony that DeCarlo responded to her email thirty (30) minutes after it was sent is false. Moreover, even if the statement is false, it does not appear to be the type of intentional, material misstatement that would justify dismissal of the indictment. "'Misstatements or mistakes alone do not justify dismissing an indictment that is facially valid.'" <u>Maceo</u>, 873 F.2d at 4 (quoting <u>United States v. Johnson</u>, 767 F.2d 1259, 1275 (8th Cir. 1985)).

DeCarlo objects to Statement (ii), that he told "Valerie Murphy," during the March 7, 2003 chat conversation, that he was looking for a girl between ten (10) and eighteen (18) years old. He does not dispute that that statement clearly appears in the chat transcript (Trial Ex. 10 at 1), but he asserts that the transcript could have been altered. (D.E. 1 at 13.) As previously noted, <u>see</u> <u>supra</u> p. 15, DeCarlo has the burden of establishing that the transcript was altered. His speculation that it could have been

---

[16]    11/10/03 Tr. at 75-76, 115.

[17]    Trial Ex. 11, p. 1.

[18]    That discussion occurs at p. 2 of the seven-page transcript of the conversation. (Trial Ex. 10.)

altered is insufficient to establish that Deputy Dallosta committed perjury and that the prosecutor was aware of that perjury.

Finally, with respect to Statement (vii), DeCarlo complains about testimony that he stated, during the March 7, 2003 chat conversation, that he was in love with the girl. (D.E. 1 at 13.) An examination of the transcript of the March 7, 2003 chat reveals that DeCarlo made the following statements: "i will do everything to make sure she is very muched [sic] loved" (Trial Ex. 10 at 1); "i will love her and cherish her for the rest of my life (<u>id.</u> at 4); "she needs love and i want to give it to her" (<u>id.</u>); "i will [love her] every minute we are together" (<u>id.</u>); "i think i am falling for her" (<u>id.</u> at 5); and "if she wants to be with me than i will be her's [sic] and only her's [sic]" (<u>id.</u>). During that conversation, DeCarlo also typed a message intended for "Samantha:"

> **daddywantsagirl_veryynggirl:** i want her to read what i am about to type to her
> **insaneblondie76:** sure
> **insaneblondie76:** let me go get her
> **insaneblondie76:** ok go ahead
> **daddywantsagirl_veryynggirl:** sam if GOD came down here and said that he would give me all his angel's [sic] if i would not be with you i would say thank's [sic] but no thank's because you are my angel
> **daddywantsagirl_veryynggirl:** you are all i will ever need in my life

(<u>id.</u> at 6). DeCarlo concluded the chat by saying: "tell samantha i do love her." (<u>Id.</u> at 7.) It appears, therefore, that Statement (vii) does not constitute perjury.

For all the foregoing reasons, the third issue is without merit and is DISMISSED.

In his fourth issue, DeCarlo argues that Deputy Dallosta committed perjury during her testimony at trial that, thirty (30) minutes after she sent the email to "daddywantsagirl_veryyngirl@yahoo.com", Defendant contacted her. (D.E. 1 at 14.)

As a preliminary matter, this issue is not cognizable in a § 2255 motion because it could have been raised on direct appeal. The issue is, therefore, procedurally defaulted, and even if DeCarlo were to argue that his appellate attorney rendered ineffective assistance—which he has not done—his default cannot be excused because he is not actually innocent. See supra pp. 10-11. Moreover, the issue is completely lacking in substantive merit for the reasons previously discussed. See supra pp. 29-30. The statement is substantially accurate and, even if it were the case that DeCarlo did not respond to the email message for three hours, there is no dispute that he had a chat conversation with "Valerie Murphy" on March 7, 2003.

Therefore, Defendant's fourth issue is without merit and is DISMISSED.

In his fifth issue, Defendant suggests that Dallosta could have altered the transcripts using the "cut and paste" method. (D.E. 1 at 15.) Contrary to Defendant's assertion (D.E. 1 at 6), this is not newly discovered evidence of innocence. As previously noted, DeCarlo's suggestion that the transcript could have been altered is nothing more than speculation. See supra pp. 14-15, 30.

32

Moreover, DeCarlo's theory is not newly discovered. Defense counsel argued the theory during closing arguments, noting that the prosecution did not introduce evidence obtained from DeCarlo's computer or from Yahoo and that the sole source of the transcripts was Deputy Dallosta. (11/12/03 Tr. at 315-16, 317-19, 319-2021; see also id. at 245, 248-49 (cross-examination of Dallosta).) In particular, defense counsel argued as follows:

> Now, we also know that there has been testimony that the only online chats, instant messaging, was what's been introduced here in court today. But, again, we don't have Mr. DeCarlo's computer, we don't have anything from Yahoo to prove that, and the agent has testified herself that the instant messages that were saved were done at her discretion, the chat sessions. She had to save them; she had to title them. Better proof would be proof from a neutral body, whether it be the actual physical computer itself of Mr. DeCarlo's, which wouldn't have a motive or bias.

Id. at 319-20. The jury necessarily rejected the argument when it voted to convict Defendant on both counts.

The fifth issue is DISMISSED as it is meritless.

In his sixth issue, which was raised in the October 18, 2006 amendment (D.E. 4), DeCarlo argues that the prosecutor engaged in misconduct. In particular, Defendant contends that the prosecutor (i) made an argument in his closing statement that was inconsistent with the indictment; (ii) stated during closing argument that Defendant was lying; and (iii) knowingly introduced perjured testimony.

Just as with the previous issues, this issue is not cognizable in a § 2255 motion because it could have been raised on direct appeal. Moreover, even if it is assumed that the waiver of

this issue was due to the ineffective assistance of trial and appellate counsel, which DeCarlo has not stated is the case, he may not obtain relief under § 2255 because he is not actually innocent.

Moreover, the issue is without merit. The legal standard for evaluating a claim of prosecutorial misconduct is the following:

> The Sixth Circuit has adopted a two-step approach for determining when prosecutorial misconduct warrants a new trial. See United States v. Carroll, 26 F.3d 1380, 1385-87 (6th Cir. 1994). Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper. Id. at 1387; see also Boyle v. Million, 201 F.3d 711, 717 (6th Cir. 2000). If the remarks were improper, the court must then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal. These four factors are as follows: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. Carroll, 26 F.3d at 1385; see also Boyle, 201 F.3d at 717; United States v. Collins, 78 F.3d 1021, 1039 (6th Cir.), cert. denied, 519 U.S. 872 . . . (1996).

United States v. Carter, 236 F.3d 777, 783 (6th Cir. 2001).

DeCarlo's claim that the prosecutor made a statement about his intent during closing arguments that contradicted the indictment is not clearly articulated. DeCarlo appears to take issue with the fact that count 1 of the indictment says the crime was committed "[b]etween on or about March 11, 2003 and on or about March 12, 2003," whereas the prosecutor argued that DeCarlo formulated the intent to commit the crime during the first online chat conversation on March 7, 2003 (see 11/12/03 Tr. at 302-03.) DeCarlo overlooks the fact that a violation of 18 U.S.C. § 2241(c) requires a defendant to "cross[] a State line." Although DeCarlo may have intended to

commit the crime on March 7, 2003, the violation of 18 U.S.C. § 2241(c) occurred in the dates stated in the indictment, when the state line was crossed. The prosecutor's references to the March 7, 2003 conversation do not contradict the indictment and, therefore, this claim of misconduct is meritless.

DeCarlo is correct that, during closing argument, the prosecutor stated, several times, that "[h]e's lying in that statement" that he gave to the FBI. (11/12/03 Tr. at 309; see also id. at 323 ("He lied. He lied.").)

"It is well established that the personal opinion of counsel has no place at trial." United States v. Collins, 78 F.3d 1021, 1039 (6th Cir. 1996). "On the other hand, counsel must be given leeway to argue reasonable inferences from the evidence. Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." Id. at 1040. In this case, the remarks at issue were made during the discussion of the statement DeCarlo gave to investigators after his arrest, in which he claimed that he was traveling to Tennessee to look for work. The prosecutor was noting that DeCarlo never mentioned a job search during his online conversations with "Valerie Murphy," and urged the jury to infer that his statement to investigators was a lie. DeCarlo's statement, and the various emails and chat transcripts, were admitted into evidence, and the jury was able to make its own evaluation of the evidence. The statements were a comment on the evidence, rather than the personal belief of the prosecutor. United States v. Marzette, Nos. 96-3207, 98-3391, 2000

WL 32044, at *4 (6th Cir. Jan. 6, 2000). Even if the statements were improper, the error was cured by the Court's instruction that "anything that the lawyers say is not evidence in the case. (11/12/03 Tr. at 326). <u>Marzette</u>, 2000 WL 32044, at *4.

Finally, DeCarlo complains that the prosecutor knowingly introduced the perjured testimony of Deputy Dallosta. The specific instances of "perjury"—that DeCarlo did not receive the initial email message sent by "Valerie Murphy," that he did not respond to that message within the hour, and that he supposedly said "it would be wrong" when "Murphy" raised the subject of sex with the girl—were previously discussed and determined to be without substance. As there was no perjury, there can be no question that the prosecutor knowingly presented perjured testimony.

The fifth issue is DISMISSED.

In his first issue, DeCarlo argues that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. Specifically, DeCarlo complains that his attorney, Assistant Federal Defender J. Patten Brown, III,[19] (i) refused to raise an issue as to the false statements made by Deputy Dallosta in the arrest warrant affidavit; (ii) did not prepare for trial; (iii) did not adequately cross-examine Deputy Dallosta about an internal affairs investigation; and (iv) admitted during closing argument that the Government had proven his guilt. (D.E. 1 at 8-9.)

---

[19]     On September 11, 2003, Mr. Brown was substituted for another Assistant Federal Defender, who had a military obligation. (Cr. D.E. 50.) Defendant made several motions to dismiss his attorney (Cr. D.E. 51, 53, 54-55), all of which were denied (<u>see, e.g.</u>, Cr. D.E. 59).

A claim that ineffective assistance of counsel has
deprived a defendant of his Sixth Amendment right to counsel is
controlled by the standards enunciated in <u>Strickland v. Washington</u>,
466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's
> assistance was so defective as to require reversal of a
> conviction or death sentence has two components. First,
> the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors
> so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the deficient performance prejudiced
> the defense. This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable. Unless a
> defendant makes both showings, it cannot be said that the
> conviction or death sentence resulted from a breakdown in
> the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a
defendant must demonstrate that "counsel's representation fell below
an objective standard of reasonableness." <u>Id.</u> at 688.

> Judicial scrutiny of counsel's performance must be
> highly deferential. It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act or
> omission of counsel was unreasonable. . . . A fair
> assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court
> must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged
> action "might be considered sound trial strategy."

<u>Id.</u> at 689 (citation omitted); <u>see also</u> <u>Coe v. Bell</u>, 161 F.3d 320,
342 (6th Cir. 1999) ("The specifics of what Coe claims an effective

lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'") (citations omitted).

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id. at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Additionally, however, in analyzing prejudice,

> the right to the effective assistance of counsel is
> recognized not for its own sake, but because of the
> effect it has on the ability of the accused to receive a
> fair trial. Absent some effect of the challenged conduct

38

on the reliability of the trial process, the Sixth
Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (citing United States
v. Cronic, 466 U.S. 648, 658 (1984)); see also Strickland, 466 U.S.
at 686 ("The benchmark for judging any claim of ineffectiveness must
be whether counsel's conduct so undermined the proper functioning
of the adversarial process that the trial cannot be relied on as
having produced a just result."). "Thus analysis focusing solely on
mere outcome determination, without attention to whether the result
of the proceeding was fundamentally unfair or unreliable, is
defective." Lockhart, 506 U.S. at 369.

DeCarlo first contends that his attorney rendered
ineffective assistance by refusing to challenge the false statements
by Deputy Dallosta in the arrest warrant affidavit. As previously
discussed at length in connection with the second issue, see supra
pp. 7-24, the Court has concluded that DeCarlo's substantive
challenge to the arrest warrant affidavit is meritless. Therefore,
DeCarlo cannot establish either that his attorney rendered
ineffective assistance when he refused to make these arguments or
that there is a reasonable probability that, if only defense counsel
had moved to quash the arrest warrant on that basis, the outcome of
the criminal case would have been different.

Next, DeCarlo complains that his attorney did not prepare
for trial. DeCarlo bases this claim on an isolated exchange, during
the early part of the testimony of Deputy Dallosta, in which defense
counsel claimed not to have copies of certain documents pertaining
to the initial stage of the investigation, before DeCarlo became the

39

focus of inquiry. (11/10/03 Tr. at 83-87.) The sidebar discussion suggested that DeCarlo's former attorney had been afforded the opportunity to examine and copy the documents in the Government's possession, but he may not have chosen to make copies of the documents that did not specifically pertain to DeCarlo. (See id. at 83-85.) As an experienced criminal lawyer, Mr. Brown was familiar with the manner in which discovery is conducted. (Id. at 85 ("I'll accept [the prosecutor's] proffer that that's what happened. . . . That's the way it works, I do know."). That exchange does not establish that counsel was unprepared. Moreover, DeCarlo's written motion to dismiss counsel, which was filed in the criminal case, makes clear that his attorney reviewed the relevant documents pertaining to his conduct and discussed them with him prior to trial. (Cr. D.E. 55 at 1.)

    DeCarlo also complains that his attorney "says that some evidence the prosecutor was identifying could have been made by his client and even this Court seemed surprised by Mr. browns [sic] comment." (D.E. 1 at 8.) Defendant is referring to the same sidebar conversation addressed in the preceding paragraph, which concerned documents introduced during the testimony of Deputy Dallosta to document the steps she took before the investigation focused on DeCarlo. Counsel objected to introduction of certain documents on the ground that they did not pertain to DeCarlo and that he would be prejudiced by the association with offensive statements he did not make or endorse. (11/10/03 Tr. at 85-87.) During that discussion, the following exchange occurred:

MR. BROWN:      Well, I would still object. I would also object on the grounds of on 403, the balancing test. I mean, if she went to this home page and found my client, that's fine. But there is a lot of stuff here that other people have written about having sex with virgins and little girls. I don't believe that the government can prove they were my client.

MR. NEWSOM:      We are not alleging that they are, Your Honor.

MR. BROWN:      While it certainly may arguably be—

THE COURT:      Excuse me. Are any of these poll questions here supposedly written by him?

. . . .

THE COURT:      You are not suggesting or saying that these necessarily are written by Mr. DeCarlo?

MR. NEWSOM:      No, absolutely not. No, Your Honor.

(Id. at 86-87.) It is not clear what point Mr. Brown was attempting to make when he said "[w]hile it certainly may arguably be," but it clearly was not an admission of guilt. There was also no prejudice, as the statement was not made in front of the jury and the Court did not overrule the objection. (Id. at 87.)

Next, DeCarlo complains that, although his attorney objected to introduction of a tape recording of a telephone conversation he had with Deputy Dallosta, whose voice was altered to sound like that of a ten-year-old child, he did not object to the Court's ruling. (D.E. 1 at 8.) Counsel objected to introduction of a tape recording of that conversation because he did not receive prior notice of its existence (11/12/03 Tr. at 203), and the Court sustained the objection (id. at 210-11, 213.) Defense counsel also objected to any testimony by Deputy Dallosta about the conversation (id. at 211-12), and that objection was overruled (id. at 212-13.)

41

Deputy Dallosta then testified that she had a three (3) to four (4) minute conversation with DeCarlo on March 11, 2003 in which she represented herself as a ten-year-old girl. (Id. at 213-14.) Deputy Dallosta did not testify to any statement made by either party during that conversation. DeCarlo does not demonstrate that there was any viable issue for appeal. In light of the overwhelming evidence against DeCarlo from the emails and chat transcripts, he cannot establish that he was prejudiced by introduction of that testimony.

DeCarlo also contends that his attorney did not adequately cross-examine Deputy Dallosta about an internal affairs investigation. Under Fed. R. Evid. 608(b), a witness may be impeached by specific instances of conduct only "if probative of truthfulness or untruthfulness." Counsel had learned, through a news report, that Dallosta was the subject of an Internal Affairs investigation for allegedly violating a policy that Shelby County Deputy Sheriffs live within Shelby County. During cross-examination, defense counsel started to ask about the policy, and the Government objected. (11/12/03 Tr. at 250.) After a sidebar discussion (id. at 250-53), defense counsel was permitted to ask Deputy Dallosta, outside the presence of the jury, whether she signed any declaration that falsely stated she lived in Shelby County, and the witness responded that she did not (id. at 256-57). Counsel then properly conceded that the subject was not appropriate impeachment under Rule 608(b). (Id. at 257-58.)

DeCarlo also complains that his attorney defended Deputy Dallosta when it was brought to the Court's attention that she had a conversation with a juror. (D.E. 1 at 8.) At the beginning of the second day of trial, a juror disclosed that, while riding in the elevator, Deputy Dallosta remarked on a book the juror was carrying, The Runaway Jury, and asked if she had seen the movie. (11/12/03 Tr. at 163.) Dallosta said she did not know the woman was a juror. (Id.) Mr. Brown then stated, "Your Honor, I'll say that I witnessed the conversation, and it was obvious that she didn't know who she was, and they exchanged maybe ten words." (Id. at 164.) If Mr. Brown was present during the exchange, he had an obligation, as an officer of the Court, to advise about what he heard. This statement does not constitute ineffective assistance.

Finally, DeCarlo argues, without any citation to the record, that, during closing arguments, his attorney "told the Jury that the Government had proven his client's guilt." (D.E. 1 at 8.) The Court has reviewed the closing argument made by defense counsel (11/12/03 Tr. at 310-21), and there was no admission by him that DeCarlo was guilty.

The first issue is DISMISSED as meritless.

The motion, together with the files and record in this case "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; see also Rule 4(b), Section 2255 Rules. Therefore, the Court finds that a response is not required from the United States Attorney and that the motion may be resolved without an evidentiary hearing. United States v. Johnson, 327 U.S. 106, 111

(1946); <u>Baker v. United States</u>, 781 F.2d 85, 92 (6th Cir. 1986).
Defendant's conviction and sentence are valid and therefore, his
motion is DENIED.

Consideration must also be given to issues that may occur
if Defendant files a notice of appeal. Twenty-eight U.S.C. § 2253(a)
requires the district court to evaluate the appealability of its
decision denying a § 2255 motion and to issue a certificate of
appealability ("COA") only if "the applicant has made a substantial
showing of the denial of a constitutional right." 28 U.S.C. §
2253(c)(2); <u>see also</u> Fed. R. App. P. 22(b); <u>Lyons v. Ohio Adult
Parole Auth.</u>, 105 F.3d 1063, 1073 (6th Cir. 1997) (district judges
may issue certificates of appealability). No § 2255 movant may
appeal without this certificate.

In <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000), the
Supreme Court stated that § 2253 is a codification of the standard
announced in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983), which
requires a showing that "reasonable jurists could debate whether
(or, for that matter, agree that) the petition should have been
resolved in a different manner or that the issues presented were
"'adequate to deserve encouragement to proceed further.'" <u>Slack</u>, 529
U.S. at 484 (quoting <u>Barefoot</u>, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations
on the issuance of certificates of appealability:

> [O]ur opinion in <u>Slack</u> held that a COA does not require
> a showing that the appeal will succeed. Accordingly, a
> court of appeals should not decline the application of a
> COA merely because it believes the applicant will not
> demonstrate an entitlement to relief. The holding in
> <u>Slack</u> would mean very little if appellate review were

44

> denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "'has already failed in that endeavor.'"

Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (quoting Barefoot, 463 U.S. at 893). Thus,

> [a] prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. . . . We do not require petitioners to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also id. at 342 (cautioning courts against conflating their analysis of the merits with the decision of whether to issue a COA; "The question is the debatability of the underlying constitutional claim, not the resolution of that debate.").[20]

In this case, for the reasons previously stated, Defendant's claims are plainly lacking in substantive merit and, therefore, he cannot present a question of some substance about which reasonable jurists could differ. The Court therefore DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to

---

[20]   By the same token, the Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." Id. at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." Id.

appeals of orders denying § 2255 motions. <u>Kincade v. Sparkman</u>, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal <u>in</u> <u>forma</u> <u>pauperis</u> in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). <u>Kincade</u>, 117 F.3d at 952.[21] Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal <u>in</u> <u>forma</u> <u>pauperis</u>, the prisoner must file his motion to proceed <u>in</u> <u>forma</u> <u>pauperis</u> in the appellate court. <u>See</u> Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter is not taken in good faith, and leave to appeal <u>in</u> <u>forma</u> <u>pauperis</u> is DENIED. Accordingly, if Movant files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to

---

[21]    Effective April 9, 2006, the appellate filing fee increased from $255 to $455.

proceed <u>in forma pauperis</u> and supporting affidavit in the Sixth

Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 7th day of May, 2007.

<u>s/ J. DANIEL BREEN</u>
UNITED STATES DISTRICT JUDGE

47